Mark L. Javitch (CA SBN 323729)
JAVITCH LAW OFFICE
480 S. Ellsworth Ave
San Mateo, CA 94401
Telephone: (650) 781-8000
Facsimile: (650) 648-0705
mark@javitchlawoffice.com
*Attorney for Plaintiff and the putative Classes*

[Additional attorneys listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| RADEK BARNERT, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>HP, INC. d/b/a HP COMPUTING AND PRINTING INC., a Delaware Corporation,<br><br>        Defendant. | Case No.:  5:21-cv-_____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff RADEK BARNERT ("Plaintiff" or "Mr. Barnert"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant HP, INC. d/b/a HP COMPUTING AND PRINTING INC. ("HP" or "Defendant") and makes the following allegations based on personal knowledge as to facts pertaining to his own experiences, and on information and belief as to all others:

## <u>NATURE OF THE ACTION</u>

1.      In a rush to convert its business model to a subscription-based business, HP launched its subscription-based "Instant Ink" program (the "Program"), which is supposed to provide owners of HP printers with an essentially endless supply of printer ink—without ever having to wait to purchase new ink cartridges—because replacement ink cartridges are always at the ready.  Indeed, HP promises consumers that if they enroll their printer in the Program (and pay the associated flat monthly fee), they will "never run out" of ink and will receive "ink the moment [they] need it."[1]

2.      The Program is intended to work as follows: (1) an enrolled printer communicates with HP through the Internet, allowing HP to detect when that printer is running low on ink; (2) when it is detected that an enrolled printer is low on ink, HP ships replacement ink cartridges to the end user; (3) the end user receives the replacement ink cartridges prior to exhausting the supply of ink in his or her existing ink cartridges; (4) the end user installs the new ink cartridges as soon as his or her existing ink cartridges run out of ink; and (5) the process begins anew.

3.      Program subscribers ("Subscribers") may choose one of several plans that permit printing anywhere from 15 pages per month to 700 pages per month, depending on their printing needs. HP promises Subscribers that they will be provided a sufficient number of free ink cartridges that will enable them to print the selected number of prints per month.

4.      Since Subscribers to the Program's high-volume plans anticipate using more ink, the threshold at which a shipment of replacement ink cartridges is triggered is higher than for Subscribers to

---

[1] https://www.bestbuy.com/site/hp/hp-instant-ink/pcmcat1474927211435.c?id=pcmcat1474927211435; https://instantink.hpconnected.com/us/en/l/.

the Program's low-volume plans. As such, the volume of the plan selected by a given Subscriber essentially determines how frequently he or she will receive replacement ink cartridges.

5.    HP also promises that Subscribers can recycle used printer cartridges through a "prepaid," "hassle-free" recycling program intended to reduce the environmental impact of the printer cartridges that they use.[2] Through this free (to Subscribers) recycling program, Subscribers can just "drop uses cartridges in HP's prepaid envelope and [HP] will handle the rest."[3]

6.    However, the Program comes with two significant catches, as described below.

7.    First, Subscribers can only use ink cartridges supplied by HP through the Program, such that they cannot use HP replacement ink cartridges purchased directly from stores.

8.    But, in HP's marketing materials regarding the Program, HP does not mention that Subscribers can *only* use ink cartridges supplied by HP through the Program while they are subscribed to the Program.

9.    In theory, this restriction should not matter, as—based on HP's representations, such as that "cartridges are shipped before you need them, so you never run out"[4]—Subscribers should always have replacement ink cartridges at the ready. In practice, however, HP routinely cannot deliver upon the promises it made regarding the Program.

10.    Specifically, HP routinely fails to timely provide Subscribers with replacement printer cartridges, and, even when it does, Subscribers find themselves overwhelmed with errors that prevent them from printing. Put another way, besides being unable to keep its printers stocked with ink, HP's printers commonly display error messages that render them inoperable, even when ink is available.

11.    As a result, Subscribers have been unable to use their printers for extended periods of time, rendering their printers entirely worthless, as those printers cannot accomplish their sole purpose: printing.

---

[2] https://instantink.hpconnected.com/us/en/l/.

[3] https://www.bestbuy.com/site/hp/hp-instant-ink/pcmcat1474927211435.c?id=pcmcat1474927211435.

[4] https://instantink.hpconnected.com/us/en/l/.

**CLASS ACTION COMPLAINT**

5:21-cv-_____

12.     When Subscribers complain about these issues, HP claims it cannot fix the problems. Instead, HP simply offers to ship more ink cartridges, which sometimes, but not always, resolves the issue. But, even that is far from a satisfactory solution, because Subscribers' printers remain inoperable for at least the amount of time it takes for replacements to arrive—which can be eight (8) days or longer, assuming that the ink cartridges included in the next shipment resolve this issue, which is often *not* the case (as it commonly takes *multiple* additional shipments before a Subscriber receives working ink cartridges).  For example, although Plaintiff was subscribed to HP's Program, based on the promise of reliable printing and endless ink, Plaintiff was unable to use his printer for thirty-five (35) days due to these issues.

13.     The Program's second catch is that the ink cartridges supplied through the Program will not function if Subscribers cancel their subscriptions, meaning that Subscribers must remain subscribed to the Program in order to use the ink cartridges supplied by HP; otherwise, they are required to purchase costly replacement ink cartridges from local retailers to continue using their printers after cancelation.

14.     The result of this restriction is that, upon cancelation of a subscription to the Program, Subscribers are effectively required to pay twice for one ink cartridge, as the Subscribers can no longer use the existing ink cartridge they received (and paid for) through the Program, and instead they must prematurely purchase a new ink cartridge to replace the otherwise useable ink cartridge provided through the Program.

15.     HP also does not fully and accurately disclose this restriction.  Rather, HP represents that Subscribers can "change or cancel [their] plan any time, at no extra cost," and states that "if you decide to cancel your [subscription], you *can* go back to using" ink cartridges purchased at retail.[5] (emphasis added).

16.     HP use of the word "can" is misleading—because in reality, former Subscribers *must immediately* go back to using ink cartridges purchased at retail after cancelation—and, coupled with the representation that a subscription can be canceled at no extra cost, falsely implies that former Subscribers will have the option of continuing to use the ink cartridges supplied by HP through the Program—at least

---

[5] https://www.bestbuy.com/site/hp/hp-instant-ink/pcmcat1474927211435.c?id=pcmcat1474927211435; https://instantink.hpconnected.com/us/en/l/.

**CLASS ACTION COMPLAINT**

until they run out—after canceling their subscriptions. Indeed, any reasonable consumer would consider the need to pay to replace an otherwise usable ink cartridge—that was already paid for through a subscription—as an "extra cost" associated with cancelation.

17. Put another way, HP misrepresents and actively conceals the fact that there *are* costs associated with canceling a subscription to the Program—*i.e.*, the costs associated with buying ink cartridges at retail to replace otherwise useable ink cartridges provided (and previously paid for) through the Program.

18. As a result of the Program's two aforementioned restrictions, Subscribers are left without any adequate recourse to remedy HP's failure to perform its contractual obligations under the Program, and the extensive downtimes caused thereby. Subscribers cannot "take their business elsewhere," or even purchase HP replacement ink cartridges from stores directly, because, as noted above, the terms of the Program require them to remain subscribed to the Program in order to use their printers, and, as long as they are subscribed, their printers will only accept ink cartridges provided through the Program

19. Subscribes are also unable to simply cancel their subscriptions to the Program, as it will cause them to incur the costs associated with purchasing replacement ink cartridges from local retailers, the avoidance of which was precisely why they subscribed to the Program in the first place (or purchased a printer with a subscription to the Program included in the purchase price).

20. As such, Subscribers are left with a choice between two undesirable options: (1) canceling their subscriptions and incurring additional costs in connection with purchasing replacement ink cartridges from local retailers, or (2) remaining enrolled in the Program and being subjected to excessive downtimes, error messages, and unending calls/chats with HP technical support.

21. Moreover, many Subscribers, such as Plaintiff, also cannot simply cancel their subscriptions because the HP printers that they purchased included a two-year prepaid subscription to the Program, which can only be redeemed in full. In other words, these Subscribers (such as Plaintiff) have *already* paid for two years of the Program, such that, if they cancel their subscriptions, they will forfeit the money they paid in exchange for the right to utilize the Program for two years.

22. Accordingly, these Subscribers, such as Plaintiff, are left with the unenviable choice between (1) canceling their subscriptions, losing out on the money they already paid to enroll in the

Program, and incurring additional costs in connection with purchasing replacement ink cartridges from local retailers, or (2) remaining enrolled in the Program and being subjected to excessive downtimes, error messages, and unending calls/chats with HP technical support.

23. In addition to the foregoing, all Subscribers are harmed by HP's failure to deliver upon its promises because they do not receive the full value of the service that they pay for. Indeed, the entire purpose of the Program is to ensure than Subscribers "never run out" of ink and receive "ink the moment [they] need it," but, due to HP's failures, this simply does not happen.[6]

24. For these reasons, Plaintiff has tried to rescind his contract, cancel his subscription to the Program, and tender his printer for return to no avail. This is likely true of other Subscribers as well.

25. Further, even though HP promises its environmentally conscious Subscribers that it will recycle the cartridges provided through the Program for free by providing Subscribers with prepaid shipping materials to return them to HP, HP has reneged on this promise. For example, after sending Plaintiff several replacement ink cartridges that simply did not work, HP instructed Plaintiff to throw those cartridges away instead of recycling them, and refused to provide Plaintiff with the necessary shipping materials to return them to HP at no cost. As a result, Plaintiff had to send those replacement ink cartridges to HP for recycling at his own expense.

26. HP also assures its environmentally conscious Subscribers that subscribing to the Program "means fewer cartridges travel shorter distances and require less packages."[7] However, such is not the case, as HP's only remedy for the aforementioned failures of the ink cartridges provided through the Program is to ship *more* ink cartridges, necessarily requiring additional travel packaging.

27. Plaintiff and members of the Classes (defined below) would not have purchased HP printers, nor would they have enrolled in the Program, had they known that HP would not be able to perform its obligations and promises pursuant to the terms of the Program.

---

[6] https://www.bestbuy.com/site/hp/hp-instant-ink/pcmcat1474927211435.c?id=pcmcat1474927211435; https://instantink.hpconnected.com/us/en/l/.

[7] https://instantink.hpconnected.com/us/en/l/.

**CLASS ACTION COMPLAINT**

5:21-cv-_____

28. Since HP cannot fulfill its promise of consistent printer performance and recycling, HP is liable for breach of contract via the implied covenant of good faith and fair dealing, as well as under various consumer protection statutes.

## PARTIES

29. Plaintiff RADEK BARNERT is an individual residing in the state of New York.

30. Defendant HP, INC. d/b/a HP Computing and Printing Inc. is a Delaware corporation with its principal place of business located at 1501 Page Mill Road, Palo Alto, California, 94304.

## JURISDICTION AND VENUE

31. The Court has original subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332(d), because the case is brought as a class action pursuant to Fed. R. Civ. P. 23, there are 100 or more members of the proposed Classes, the amount in controversy exceeds $5,000,000, exclusive of costs, and Plaintiff and Defendant are citizens of different states.

32. This Court has general personal jurisdiction over HP because HP's headquarters and principal place of business are located in Palo Alto, California.

33. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because HP resides in this District.

## INTRADISTRICT ASSIGNMENT

34. Pursuant to Civil L.R. 3-2(c), this case is properly assigned to the San Jose Division because a substantial part of the events or omissions that give rise to Plaintiff's and Class members' claims occurred in the County of Santa Clara, California.

## COMMON FACTUAL ALLEGATIONS

35. HP is the largest seller of home, office, and enterprise printers in the United States and sells associated ink cartridges for its printers. HP employs a "razor and blades" business model, where the bulk of its profit is derived from its sales of consumable supplies (like toner and ink) instead of from the sales of its printers themselves. Due to HP's use of this razor and blades model, the overall long-term

**CLASS ACTION COMPLAINT**

5:21-cv-_____

cost of owning and operating an HP printer is difficult to evaluate for the customer at the point of sale, especially compared to competing printers.[8]

36.     HP's net revenue from supplies (*e.g.*, toner and ink) alone in 2019 was $12.9 billion. Consistent with its razor and blades model, its net revenues from hardware (*e.g.*, printers, among others) came to $7.1 billion in 2019.[9]

37.     HP depends on its extremely high-priced, recurring supply cartridge sales as the lifeblood of its business. Indeed, commentators have remarked that the price per ounce of HP's ink and toner range between the prices of silver and gold (at $4,731 per gallon).[10] HP's original supplies are so excessively priced that a recent check of Amazon.com found that the HP branded set of color toner supply cartridges were being offered for sale at a seven hundred eleven percent (711%) premium above several non-HP listings that had earned positive customer reviews. And, this is in addition to excessive shrinkflation (rising costs for decreasing volumes) that HP supplies have undergone in recent years, which contributes to the value disparity.[11] Accordingly, HP admits in its annual report that it intends to keep its prices high; otherwise, its operating results could be adversely affected.

38.     The critical component of a successful razor and blades business model is that the market for the replacement consumable(s) must be closed to competitors. If consumers can purchase "blades" from anyone else, the model fails, as it cuts off the revenue stream generated from the exclusive sale of

---

[8] *See* Anirudh Dhebar, "Innovating Around the Classic Razor-And-Blades Pricing Model" Babson College, April 2017, https://www.babson.edu/academics/executive-education/babson-insight/strategy-and-innovation/razor-and-blades-pricing-model/#.

[9] *See* 2019 10K, HP Inc. at 72. *Notes to Consolidated Financial Statements (Continued)*. https://s2.q4cdn.com/602190090/files/doc_financials/2019/ar/hp-inc_10-ka-(1).pdf.

[10] *See* Eduardo Porter, "Why Printer Ink Is the Other 'Black Gold.'" *All Things Considered*, NPR, May 24, 2012. https://www.npr.org/2012/05/24/153634897/why-printer-ink-is-the-other-black-gold.

[11] David Robinson, *Printer Ink Cartridges: Why You're Paying More but Getting a Lot Less*, The Guardian, February 23, 2013. https://www.theguardian.com/money/2013/feb/23/printer-ink-cartridges-paying-more-getting-less.

replacement consumables, or, at the very least, renders the market for replacement consumables substantially more competitive, driving prices down.

39.     As a result, HP fears competition in its "Printing Supply Business" from what it refers to as "independent suppliers," who offer "non-original supplies (including imitation, refill or remanufactured alternatives) for some of our LaserJet toner and Inkjet cartridges."[12] HP has warned that "[f]inancial performance could also decline due to increased competition from … non-original supplies[.]"[13] "For example, our supplies business has recently experienced declining revenues due to declines in market share, installed base and usage, and increased customer pricing sensitivity."[14]

40.     Competitors in the printer supplies market have continually eaten into the market share for HP-compatible ink and toner supply cartridges. As HP states in its 2019 annual report: "independent suppliers offer non-original supplies (including imitation, refill and remanufactured alternatives), which are often available for lower prices."[15] "Net revenue for Supplies decreased 4.8% as compared to the prior-year period, primarily due to demand weakness."[16]

41.     Based on the competitive risks identified by HP, and to reverse its decline in supplies revenue, HP created a new product: contractual monthly plans known as "Instant Ink" to lock in its Subscribers and prevent their usage of competitors' supply cartridges.

42.     In its deceptively simple appeal to hassle free, environmentally friendly printing at a flat, transparent price, HP has been wildly successful in promoting and gaining subscribers to Instant Ink.

---

[12] *Id*. at 12.

[13] *Id*. at 12.

[14] *Id*. at 13.

[15] HP, Inc. 2019 Form 10-K, at 7, available at https://s2.q4cdn.com/602190090/files/doc_financials/2019/ar/hp-inc_10-ka-(1).pdf.

[16] *Id*. at 42.

43. On May 27, 2021, HP announced its second quarter results in which it "Smash[ed] [e]xpectations."[17] Total print revenue was up 28% to $5.3 billion, and total hardware units grew 42% to 10.6 billion.[18]

44. Supplies revenue was up 17% to $3.3 billion. Instant Ink "continues to resonate well with customers, with cumulative enrollees growing 7% sequentially to [9.7 million members]."[19] Quarterly Operating Profit increased $403 million to $951 million.[20]

45. HP discloses to investors supply shortages in components and commodities,[21] but when promoting Instant Ink, HP fails to inform consumers of any difficulties HP has fulfilling its promise to maintain the customer's printer with consistent performance (caused by the supply shortage or otherwise).

46. HP made the following material representations about the Program on its website:[22]

"Never run out… Your printing service includes: …Hassle-free delivery and recycling."

"When ink or toner levels are low, we automatically ship a new cartridge. Cartridges are shipped before you need them, so you never run out."

"Your subscription includes ink or toner, hassle-free delivery, and prepaid recycling."

47. Best Buy's website (*i.e.*, the website from which Plaintiff purchased his Printer) contains similar material representations:[23]

---

[17] *See* Savitz, "Eric J. HP Earnings Smash Expectations, Driven by Soaring Consumer PC Demand" *Barrons*, May 27, 2021. https://www.barrons.com/articles/hp-stock-earnings-pc-demand-51622145637.

[18] *See Marie Myers*, Chief Financial Officer. HP Inc (HPQ) Q2 2021 Earnings Call Transcript. May 27, 2021, https://www.fool.com/earnings/call-transcripts/2021/05/27/hp-inc-hpq-q2-2021-earnings-call-transcript/.

[19] *Id*.

[20] *Id*.

[21] *See* Enrique Lores*, President & Chief Executive Officer;* Marie Myers, *Chief Financial Officer*. HP Inc (HPQ) Q2 2021 Earnings Call Transcript. May 27, 2021. https://www.fool.com/earnings/call-transcripts/2021/05/27/hp-inc-hpq-q2-2021-earnings-call-transcript/.

[22] https://instantink.hpconnected.com/us/en/1/

[23] https://www.bestbuy.com/site/hp/hp-instant-ink/pcmcat1474927211435.c?id=pcmcat1474927211435

**CLASS ACTION COMPLAINT**

5:21-cv-_____

"Never run out… With HP Instant Ink, you'll get ink or toner, plus hassle-free delivery and recycling."

"It's a smart ink subscription that delivers ink the moment you need it…"

"Never run out. Your printer lets HP know when it's running low on ink and they'll send ink or toner before you run out."

"Hassle-free recycling. Drop used cartridges in HP's prepaid envelope. They'll handle the rest."

"the Cartridges will be 'Shipped automatically' when 'ink or toner levels are low'"

"HP Instant Ink FAQs
Q: What do I get?
A: …No need to worry, because your printer drops us a note and your next set of cartridges will be automatically dispatched. Simply return the old cartridges with prepaid recycling."

48.    On information and belief, HP created, developed, reviewed, authorized, and is responsible for the foregoing representations on Best Buy's website.

49.    HP went overboard when trying to "lock in" its Subscribers, because, for a number of reasons, HP could not keep its printers functioning.

50.    Sometimes the required replacement ink cartridges were out of stock and were not timely provided to Subscribers.  As a result, after running out of printer ink, Subscribers would have to wait until the replacement ink cartridges were back in stock and ultimately shipped to them before they could resume using their printers.

51.    Other times, Subscribers' printers experienced errors, and displayed error messages stating that they were unable to print because the Subscribers were "not enrolled" in the Program, even though those Subscribers were, in fact, subscribed to the Program and were using ink cartridges provided through the Program.

52.    When Subscribers sought assistance in connection with these errors, HP's only response was to repeatedly ship additional replacement ink cartridges to these Subscribers.  Those additional replacement ink cartridges took extended times to deliver (sometimes eight or more days), and frequently did not even resolve the problem, necessitating yet another shipment (and the associated wait time).

53.    HP did not attempt any other timelier or more effective methods of repair, and, in the end, Plaintiff's and Printing Class (defined below) members' printers remained inoperative for several weeks.

As a result, Plaintiff and Printing Class members lost the value of their printers, and their subscriptions, during the period they were unable to print.

54.     In sum, HP was unable to fix the problems with Plaintiff's and Printing Class members' printers, and failed to deliver its on its promises that they would "never run out" of ink and will receive "ink the moment [they] need it."[24] HP's failures led to the very annoyances that were supposed to be prevented by Plaintiff's and Printing Class members' subscription to the Program, and defeated the entire purpose of the Program, which was to ensure reliable and continued printer performance by keeping the printers stocked with working ink cartridges.

55.     Additionally, although HP promised Subscribers the ability to recycle the ink cartridges provided through the Program free of charge, so as to reduce the environmental impact of their enrollment in the Program, such was not the case.

56.     Specifically, HP assured Subscribers that they would receive postage-prepaid return envelopes that must be used to return ink cartridges to HP for "hassle-free" "prepaid recycling."[25] However, when Subscribers ask HP for instructions as to how to recycle their ink cartridges, HP informs them to throw those cartridges away, and does not provide them with the promised prepaid shipping materials.

57.     Due to HP's refusal to provide prepaid shipping materials, and HP's instruction to simply throw the ink cartridges away, environmentally conscious Subscribers, such as Plaintiff and members of the Environmental Class (defined below), are left with a choice between (1) returning their ink cartridges to HP for recycling at their own expense, thus sacrificing their contractual right to have those cartridges recycled for "free," or (2) throwing their ink cartridges in the garbage, thus foregoing their contractual right to have those cartridges recycled in the first place.

---

[24] https://www.bestbuy.com/site/hp/hp-instant-ink/pcmcat1474927211435.c?id=pcmcat1474927211435; https://instantink.hpconnected.com/us/en/l/.

[25] https://www.bestbuy.com/site/hp/hp-instant-ink/pcmcat1474927211435.c?id=pcmcat1474927211435; https://instantink.hpconnected.com/us/en/l/.

**CLASS ACTION COMPLAINT**
5:21-cv-_____

58.     Moreover, because HP is required to repeatedly send additional replacement ink cartridges to Subscribers as a result of the issues described above, Plaintiff's and Environmental Class members' enrollment in the Program is environmentally wasteful.  Indeed, instead of only receiving (and using) the precise number of ink cartridges that they need for printing purposes, Plaintiff and Environmental Class members end up receiving (and wasting) substantially *more* ink cartridges because the ones that they receive malfunction so frequently.

59.     As a result, HP's characterization of the Program as "mean[ing] fewer cartridges travel shorter distances and require less packages" is patently false.[26]

## FACTS SPECIFIC TO PLAINTIFF RADEK BARNERT

60.     On July 18, 2020, Mr. Barnert purchased an HP printer from Best Buy for store pickup at the Chelsea location at 60 W. 23rd St., New York, NY 10010-5283.

61.     Mr. Barnert purchased HP's OfficeJet 5260 Wireless All-In-One Inkjet Printer (the "Printer") for $239.99.

62.     Included in the Printer's price was a "2-year HP Instant Ink Subscription" (*i.e.*, the Program).

63.     Prior to deciding to purchase his Printer, Mr. Barnert saw and relied on HP's representations on Best Buy's website.  Those representations included the assurances that HP would provide him with (a) "hassle-free delivery" of ink cartridges that would be shipped "when ink or toner levels are low," "before you run out," and "before ink or toner is needed," so that he would "never run out" of ink, (b) "prepaid envelope[s]" for "hassle-free" "prepaid recycling" of used cartridges, and (c) "larger cartridges with less packaging" that are "sent only when ink or toner levels are low, not monthly"—*i.e.*, fewer shipments—thus benefitting the environment.[27]

---

[26] https://instantink.hpconnected.com/us/en/l/.

[27] https://www.bestbuy.com/site/hp/hp-instant-ink/pcmcat1474927211435.c?id=pcmcat1474927211435; https://instantink.hpconnected.com/us/en/l/.

64. Based on these representations, Mr. Barnert chose to purchase his Printer, and the accompanying subscription to the Program, because, together, they offered continuously available, environmentally-friendly printing and recycling in one system. For the same reasons, Plaintiff enrolled in the Program, the terms and conditions of which promised him "continued printing," consistent with the aforementioned representations on Best Buy's website.

65. However, starting in April 2021, Mr. Barnert started having trouble with his Printer. Specifically, an error message appeared on the machine that said: "Cartridge cannot be used until enrolled to instant ink."

66. In response, Plaintiff contacted HP's support via chat and also on the phone. HP told him that the only way to fix the problem was for the company to send out new cartridges.

67. Having no other feasible options, Plaintiff agreed, and HP shipped the replacement cartridges. Those replacement cartridges did not arrive until eight (8) days later.

68. Plaintiff installed those replacement cartridges, and they worked for a few days, but then the same error message appeared again.

69. Plaintiff again contacted HP, and received the same answer as before. As a result, Plaintiff tried another set of replacement ink cartridges, but that set also failed to work.

70. Plaintiff once again contacted HP and tried yet another set of replacement ink cartridges, but those cartridges again failed to fix the problem.

71. Through this repeated (and futile) process, Plaintiff spent hours on online chat with HP support going through their troubleshooting exercises, but those exercises did not enable the Printer.

72. Plaintiff ultimately asked to cancel his subscription to the Program, but the HP representative with whom he spoke said that although she could not cancel the service for Plaintiff, someone from the appropriate department would call Plaintiff back within 3-5 business days.

73. Plaintiff also asked HP to accept a return of the Printer, but the HP representative refused.

74. Even though HP sells printer cartridges at retail stores nationwide, and Mr. Barnert lives in New York City, Mr. Barnert was not able to obtain cartridges locally, because HP requires Subscribers to receive their cartridges only through the mail. As such, any locally obtained ink cartridges would not

have resolved the issues that Plaintiff experienced, unless he chose to cancel his subscription to the Program.

75.     However, if Plaintiff canceled his subscription to the Program, he would have forfeited the amounts he had *already* paid to enroll in the Program when he purchased his Printer.  In addition, HP would not reimburse Plaintiff for the costs associated with such a purchase.

76.     As such, Plaintiff had no choice but to wait until HP delivered working replacement printer cartridges.

77.     Finally, on May 14, 2021, Plaintiff received a fourth set of cartridges that appeared to resolve the issue, and he was able to resume printing.

78.     In total, Mr. Barnert was without the ability to print for approximately thirty-five (35) days.

79.     During the course of his correspondence with HP, Plaintiff asked for instructions on how to recycle the unused and malfunctioning cartridges, but the HP representative with whom he spoke told him that the cartridges were valueless, and that they should be thrown away.

80.     Contrary to its promises, HP did not provide Plaintiff with prepaid shipping materials to return the ink cartridges to HP for recycling.  As a result, Plaintiff chose to ship those ink cartridges to HP for recycling at his own expense.

81.     In sum, although Plaintiff believed that he would be able to continuously use his Printer and his 2-year subscription to the Program without restriction, in accordance with HP's promises, HP was and is unable to fulfill its promises.  As such, HP reneged on its promises that it would provide Plaintiff with (a) ink cartridges so he would "never run out" of ink, (b) "prepaid recycling" of used cartridges, and (c) an environmentally-friendly alternative to purchasing replacement ink cartridges at retail.[28]  HP also failed to provide Plaintiff with "continued printing through the [Program]," as set forth in the Program's terms and conditions.

82.     As a result of HP's conduct, Plaintiff suffered damages because he did not receive the printing and recycling services through the Program, as promised by HP. Plaintiff will likely continue to

---

[28] https://www.bestbuy.com/site/hp/hp-instant-ink/pcmcat1474927211435.c?id=pcmcat1474927211435; https://instantink.hpconnected.com/us/en/l/.

**CLASS ACTION COMPLAINT**

5:21-cv-_____

sustain these losses, as any future downtime will further deplete the value of his subscription to the Program (that he can barely use already), and the value of his Printer.

83.    Had Plaintiff been aware that HP would fail to deliver on his promises, and that he would be placed into a constant state of uncertainty as to whether HP will be able to fulfill its responsibilities for the remainder of his 2-year subscription to the Program, he would not have purchased his Printer (and the accompanying enrollment in the Program), nor would he have enrolled in the Program.

84.    Therefore, Plaintiff seeks to rescind the contract, obtain damages for breach of contract and breach of the covenant of good faith and fair dealing, and enforce consumer protection statutes, individually, and on behalf of the Classes.

## COMPLAINTS FROM CLASS MEMBERS

85.    Numerous other members of the Classes have reported experiencing the same issues as Plaintiff. A few selected comments on message boards and Internet forums regarding the problem are reproduced (unedited) below:

| May 13, 2021 | Trustpilot.com[29] | The service from HP instant ink is absolutely atrocious and totally unprofessional. I haven't had an ink cartridge delivery for months despite many contacts. |
| April 24, 2021 | Trustpilot.com | I have been on an endless loop trying to get a replacement printer and or a replacement ink cartridge to fix an error message which has caused me to go to staples daily for printing needs. |
| April 2, 2021 | Trustpilot.com | They had to send me 3 new batches of instant ink cartridges - one new printer head - and finally one whole new printer. I still cannot print. |
| March 2021 | Best Buy Reviews[30] | A complete waste of money. Cannot get status of ink. It said I had to enroll but when I tried it said I was already enrolled. When I canceled they shut off my printer. |

[29] https://www.trustpilot.com/review/hpinstantink.com (last accessed, May 18, 2021).

[30] https://www.bestbuy.com/site/reviews/instant-ink-50-page-monthly-plan-for-select-hp-printers/5119176? (last accessed, May 14, 2021).

**CLASS ACTION COMPLAINT**

5:21-cv-_____

| | | |
|---|---|---|
| January 2021 | Best Buy Reviews | Rip off. Ended up with an error message which wouldn't allow me to print. Not cool when working from home. Had to cancel plan totally, go buy my own ink, mail back their ink which was new and still wait a month before they would stop charging me. |
| May 25, 2020 | Hotukdeals.com[31] | In total I got sent 6 sets of instant ink, they seem to like sending ink out as a way of fobbing you off. |

## CLASS ALLEGATIONS

86.    **Class Definition**: Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of Plaintiff and the Classes defined as follows:

> **Printing Class**. All persons and entities in the United States who were subscribed to the HP Instant Ink Program and incurred an interruption in printing service due to an error message, faulty cartridges, or cartridges being out of stock.

> > **The New York Printing Subclass**. All persons and entities in New York who were subscribed to the HP Instant Ink Program and incurred an interruption in printing service due to an error message, faulty cartridges, or cartridges being out of stock.

> **Environmental Class**. All persons and entities in the United States who were subscribed to the HP Instant Ink Program but were not provided materials for free recycling.

> > **The New York Environmental Subclass**. All persons and entities in New York who were subscribed to the HP Instant Ink Program but were not provided materials for free recycling.[32]

87.    The following people and entities are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons and entities who properly execute and file a timely request for exclusion from the Classes; (4) persons and entities

---

[31] https://www.hotukdeals.com/discussions/hp-instant-ink-problems-cartridge-cannot-be-used-until-printer-is-enrolled-3432033 (last accessed, May 18, 2021).

[32] Collectively, the New York Printing Subclass and the New York Environmental Subclass will hereinafter be referred to as the New York Subclasses.

**CLASS ACTION COMPLAINT**

5:21-cv-_____

whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons and entities.

88.     Plaintiff reserves the ability to modify the definition of the proposed Classes before the Court determines whether class certification is warranted.

89.     As set forth below, the Fed. R. Civ. P. 23(a) elements of Numerosity, Commonality, Typicality, and Adequacy are all satisfied in this case.

90.     **Numerosity**: While exact number of members of each of the Classes is unknown and not available to Plaintiff, Plaintiff believes that each of the Classes likely consists of thousands of members. Indeed, as noted above, HP controls a large share of the printer and printer supplies markets, boasting revenues of $12.9 billion and $7.1 billion, respectively, in 2019.  As such, it is clear that individual joinder of all members of the Classes is impracticable. Members of the Classes can be identified through Defendant's records or by other means.

91.     **Commonality**: The claims of Plaintiff and each member of the Classes depend upon common contentions related to HP's failure to deliver upon its promises through the Program.  With respect to the Printing Class, the common contention is that HP—despite promising that Subscribers would never run out of ink—failed to timely provide Plaintiff and Printing Class members with working replacement ink cartridges, which rendered their printers inoperable for extended periods of time.  With respect to the Environmental Class, the common contention is that HP—despite promising that Subscribers would be able to recycle the ink cartridges that they received through the Program for free, and that subscribing to the Program would reduce the environmental impact of the use of their printers— failed to provide Plaintiff and Environmental Class members with the requisite shipping materials to enable them to recycle the ink cartridges that they received through the Program at no cost, and ended up expending more environmental resources to supply them with working ink cartridges.  The determination of the truth or falsity of these common contentions will resolve issues central to the validity of Plaintiff's and members of the Classes' claims in one stroke.

**CLASS ACTION COMPLAINT**

5:21-cv-_____

92. **Typicality**: Plaintiff's claims are typical of the claims of each of the Classes, as their claims all arise from Defendant's uniform failure to perform its obligations pursuant to the terms of the Program, and they all sustained damages as a result.

93. **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the members of the Classes. Plaintiff has no interests antagonistic to the interests of the other members of the proposed Classes and is subject to no unique defenses. Plaintiff has retained competent counsel to prosecute the case on behalf of Plaintiff and the proposed Classes, and Plaintiff's counsel is experienced in prosecuting consumer class actions such as this one. Plaintiff and Plaintiff's counsel are committed to vigorously prosecuting this action on behalf of the Class members and have the financial resources to do so.

94. In addition to satisfying the requirements of Fed. R. Civ. P. 23(a), this case satisfies the requirements of Fed. R. Civ. P. 23 (b)(2) and Fed. R. Civ. P. 23(b)(3), as set forth below.

95. **Fed. R. Civ. P. 23(b)(2) - Policies Generally Applicable to the Class**: This class action is appropriate for certification because HP has acted or refused to act on grounds generally applicable to the Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's practices challenged herein apply to and affect the Class members uniformly, and Plaintiff's challenge to those practices hinge on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiff. The relief sought in this case will apply to Plaintiff and each of the Classes uniformly.

96. **Fed. R. Civ. P. 23(b)(3) - Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Classes, and those questions predominate over any questions that may affect individual Class members. Common questions and/or issues for the Classes include, but are not necessarily limited to the following:

      i.    Whether HP's inability to timely furnish Subscribers with working replacement ink cartridges amounts to a breach of contract and/or the implied covenant of good faith and fair dealing;

ii.   Whether HP's failure to provide Subscribers with shipping materials that permit them to recycle the ink cartridges that they received through the Program for free amounts to a breach of contract and/or the implied covenant of good faith and fair dealing;

iii.  Whether HP's conduct constitutes false, misleading, or unfair conduct in violation of the consumer fraud and deceptive trade practices acts of the 50 states and District of Columbia;

iv.   Whether HP's conduct constitutes false advertising under Cal. Bus. & Prof. Code § 17500, NY GBL § 349(a) and the "Fraudulent Prong" of Cal. Bus. & Prof. Code § 17200;

v.    Whether HP's conduct constitutes unlawful and unfair conduct under the "Unlawful" and "Unfair" Prongs of Cal. Bus. & Prof. Code § 17200; and

vi.   The method of calculation and extent of damages for Plaintiff and members of the Classes.

97.   **Fed. R. Civ. P. 23(b)(3) - Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by individual members of the Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Classes to obtain effective relief in connection with Defendant's misconduct. Even if members of the Classes could mount such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort and expense will be enhanced, and uniformity of decisions ensured.

**CLASS ACTION COMPLAINT**
5:21-cv-_____

**COUNT I**
**Breach of Contract – Based on the Implied Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the Classes)**

98.     Plaintiff incorporates paragraphs 1 through 97 as if fully set forth herein.

99.     After purchasing HP printers, HP offered Plaintiff and members of the Classes the opportunity to enroll in the Program.

100.     Plaintiff and members of the Classes accepted HP's offer, and enrolled in the Program.

101.     Pursuant to the terms of the Program, HP and Plaintiff/members of the Classes furnished the other party with consideration.  Specifically, HP was obligated to provide Plaintiff and members of the Classes with replacement ink cartridges that would "allow for [their] continued printing through the [Program]," as well as to provide them with shipping materials that would allow Plaintiff and members of the Classes to recycle the ink cartridges that they received through the Program for free.  In exchange, Plaintiff and members of the Classes were obligated to pay monthly fees to remain enrolled in the Program.

102.     Although Plaintiff and some members of the Classes received 2-year subscriptions to the Program when they purchased their HP printers, they still provided HP with consideration, as the cost of those 2-year subscriptions was included in the price of the printers that they purchased.  In essence, Plaintiff and these members of the Classes prepaid their monthly enrollment fees at the time that they purchased their HP printers.

103.     Based on the foregoing, Plaintiff and members of the Classes established contracts with HP when they enrolled in the Program.

104.     "Within every contract is an implied covenant of good faith and fair dealing. This covenant is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *E.g.*, *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*, 265 A.D.2d 513, 513-14 (N.Y. App. Div. 1999) (internal citations omitted); *Brehm v. 21st Century Ins. Co.*, 166 Cal. App. 4th 1225, 1235 (Cal. Ct. App. 2008).

105.     As noted above, the Program was characterized by two key features: (1) HP was to provide Plaintiff and Printing Class members with working printer cartridges so that they would "never run out"

20

of ink and could continue using their printers without interruption—*i.e.*, "continued printing"; and (2) HP was to provide Plaintiff and Environmental Class members with prepaid shipping materials that they could use to ship used cartridges back to HP, so they could recycle the ink cartridges provided through the Program for no additional cost.

106.     Based on the implied covenant of good faith and fair dealing, HP had an obligation to reasonably provide Plaintiff and members of the Classes with these desired features of the Program. As such, even to the extent that HP is not contractually obligated to *always*, without exception, provide Plaintiff and members of the Classes with these stated benefits of the Program, HP was still required to take reasonable steps to perform its obligations under its contracts with Plaintiff and members of the Classes. Indeed, if those contracts were interpreted to not require *anything* of HP, they would be rendered illusory.

107.     Therefore, the implied covenant of good faith and fair dealing, as applied to Plaintiff's and members of the Classes' contracts with HP, required HP to keep Plaintiff's and members of the Classes' printers supplied with working printer cartridges so that they would "never run out" of ink, and would not experience an interruption in their ability to use their printers—*i.e.*, "continued printing." HP also had an obligation to provide Plaintiff and members of the Classes with prepaid shipping materials that Class members were required to use to ship used cartridges back to HP, so they could recycle the ink cartridges provided through the Program for no additional cost.

108.     In other words, Plaintiff and members of the Classes were entitled to the benefits of reasonably reliable and functional printer performance and free recycling during the term of their subscription to the Program.

109.     However, as described above, Plaintiff and members of the Classes did not receive the expected benefits under the terms of their contracts with HP, as HP failed to provide them with ink cartridges (so they would never run out of ink) or materials for prepaid recycling of used cartridges.

110.     For example, despite properly installing the ink cartridges that he was provided through the Program in his Printer, Plaintiff received an error message that he was "not enrolled" in the Program, which prevented him from using his Printer at all. Although Plaintiff was, in fact, enrolled in the Program, and despite attempting to fix this error by spending several hours communicating with HP, receiving

**CLASS ACTION COMPLAINT**

several additional shipments of replacement ink cartridges, and installing those replacement ink cartridges in his Printer, Plaintiff was still unable to use his Printer. Since HP could not fix the problem with Plaintiff's Printer, Plaintiff was unable to print for thirty-five (35) days.

111. Similarly, despite HP's contractual obligation to provide Plaintiff with prepaid shipping materials to return the ink cartridges that he received through the Program to HP for recycling, HP failed to do so. In fact, when Plaintiff asked how to recycle the ink cartridges that he received through the Program, an HP representative told him that the product should be thrown away. As a result, Plaintiff was required to ship those ink cartridges to HP for recycling at his own expense.

112. Plaintiff and members of the Classes suffered damages as a result of HP's breach of the implied covenant of good faith and fair dealing, as they did not receive anything close to the full value of the contractual benefits that they bargained for.

113. With respect to Plaintiff and Printing Class members, these damages come in the form of the printer downtime they experienced as a result of HP's failure to timely provide them with functioning replacement ink cartridges. In Plaintiff's case, this downtime amounted to thirty-five (35) days of his 2-year prepaid subscription to the Program—of which only approximately nine (9) months had elapsed.

114. As noted above, the entire purpose of Plaintiff's and Printing Class members' enrollment in the Program was to ensure that they would be able to use their printers without interruption and attain the "continued printing" that they were promised. Therefore, HP's failure to timely provide Plaintiff and Printing Class members with functioning replacement ink cartridges frustrated the entire purpose of their contracts with HP and breached the implied covenant of good faith and fair dealing.

115. Additionally, Plaintiff and Environmental Class members suffered damages as a result of HP's failure to provide them with prepaid shipping materials to return the ink cartridges that they received through the Program to HP for recycling. As noted above, Plaintiff's and Environmental Class members' enrollment in the Program was based on the expectation that they would be able to recycle the ink cartridges that they were provided through the Program—and thus reduce the environmental impact of their enrollment in the Program—at no additional cost.

116. However, because HP told Plaintiff to throw the cartridges away and failed to provide Plaintiff and Environmental Class members with prepaid shipping materials—so as to allow them to

return the ink cartridges that they received through the Program to HP for recycling—Plaintiff and Environmental Class members had to either (1) forgo recycling their ink cartridges, or (2) recycle their ink cartridges at their own expense. In Plaintiff's case, Plaintiff had to spend $5.95 to ship the cartridges back to HP for recycling, which would not have been required had HP performed its obligations under the contract (as imposed by the implied covenant of good faith and fair dealing).

117. Accordingly, Plaintiff, individually, and on behalf of the Classes, seeks damages, rescission, injunctive and other equitable relief, and all other relief provided for under the law.

**COUNT II**
**Violation of NY General Business Law § 349**
**(On Behalf of Plaintiff and the New York Subclasses)**

118. Plaintiff incorporates paragraphs 1 through 97 as if fully set forth herein.

119. The New York General Business Law ("GBL") § 349(a) prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in the state of New York.

120. HP violated NY GBL § 349(a) by using false and misleading statements to promote the sale of HP's Instant Ink Program subscriptions to Plaintiff and the New York Subclasses. As more fully set forth above, HP made misrepresentations that Plaintiff and New York Printing Subclass members would "never run out" of ink, such that they would not experience an interruption in their ability to use their printers. HP also made misrepresentations that the Program was environmentally friendly inasmuch as Subscribers would receive prepaid shipping materials that New York Environmental Subclass members could use to ship used cartridges back to HP—so they could recycle the ink cartridges provided through the Program for no additional cost—and that they would ultimately use fewer cartridges, less packaging, and less shipping.

121. HP's representations were misleading, false, and deceptive because HP failed to provide Plaintiff and the New York Printing Subclass members with working ink cartridges so they would "never run out" of ink. HP's representations were also misleading, false, and deceptive because HP failed to provide Plaintiff and the New York Environmental Subclass members with prepaid shipping materials

so that they could recycle their used ink cartridges for free, and because HP's failures caused them to use *more* cartridges, packaging, and shipping.

122. HP knew that its misrepresentations and omissions were false and misleading at the time it made them because it knew that (1) it would instruct Subscribers to simply "throw away" ink cartridges provided through the Program instead of providing them with prepaid shipping materials with which Subscribers could send ink cartridges back to HP for recycling, (2) due to supply chain issues and/or its restrictive programming of its printers, it could not possibly timely provide Subscribers with replacement ink cartridges, such that Subscribers would not always have ink available to print, and (3) it would attempt to remedy these issues by simply sending Subscribers additional ink cartridges, thus resulting in more environmental waste.

123. Prior to enrolling in the Program, Plaintiff and members of the New York Subclasses read, saw, and understood the foregoing misrepresentations and omissions, and reasonably relied on them. As such, HP's false and misleading statements deceived Plaintiff, members of the New York Subclasses, and the general public.

124. As a direct and proximate result of HP's misleading and false statements regarding the Program, Plaintiff and members of the New York Subclasses chose to enroll in the Program and/or purchase HP printers that come with a prepaid subscription to the Program. As a result, Plaintiff and members of the New York Subclasses have suffered injury-in-fact in the form of lost time and money, as well as the loss of the use of their HP printers for extended periods of time.

125. In other words, Plaintiff and members of the New York Subclasses reasonably relied to their detriment on HP's material misrepresentations and omissions.

126. After enrolling in the Program, Plaintiff and members of the New York Subclasses learned that HP could not maintain the functioning of their printers, provide enough ink cartridges on a timely basis, or provide free recycling. Instead, the cartridges commonly malfunctioned and needed to be replaced. Further, the Program was not environmentally-friendly, as HP's failures resulted in *more* environmental waste, and HP told customers to "throw away" the cartridges instead of honoring its promise to recycle them for free.

127. Therefore, Plaintiff and the New York Subclasses seek to rescind their contracts with HP and recover damages in connection with the promised features of the Program upon which HP did not deliver. Moreover, Defendant's violations were committed willfully and knowingly such that treble damages are warranted under, *inter alia*, GBL § 349(h).

128. Alternatively, to the extent that Plaintiff's and members of the New York Subclasses' contracts with HP are not rescinded, Plaintiff and the New York Subclasses seek injunctive relief requiring HP to comply with its contractual obligations, or, in the event that it does not, enable Subscribers to mitigate their damages. For example, HP should be enjoined from requiring its printers to only accept ink cartridges provided through the Program whenever it cannot timely deliver replacement ink cartridges to Subscribers, so as to allow Subscribers to purchase ink cartridges locally and continue using their printers in the interim. Similarly, to the extent that Subscribers are required to recycle their ink cartridges at their own expense, HP should be required to reimburse Subscribers for the costs that they incur.

129. Plaintiff, individually, and on behalf of the New York Subclasses, also seeks interest at the highest rate allowable by law, and an award of reasonable attorneys' fees and costs under applicable law, including GBL § 349(h).

### COUNT III
### Violation of the Consumer Fraud and Deceptive Trade
### Practices Acts of the Various States and the District of Columbia
### (On Behalf of Plaintiff and the Classes)

130. Plaintiff incorporates paragraphs 1 through 97 as if fully set forth herein.

131. Plaintiff brings this Count individually, and on behalf of all similarly situated residents of each of the 50 states and the District of Columbia for violations of the respective statutory consumer protection laws, as follows:

a. the Alabama Deceptive Trade Practices Act, Ala.Code 1975, § 8–19–1, *et seq*.;

b. the Alaska Unfair Trade Practices and Consumer Protection Act, AS § 45.50.471, *et seq*.;

c. the Arizona Consumer Fraud Act, A.R.S §§ 44-1521, *et seq*.;

d. the Arkansas Deceptive Trade Practices Act, Ark.Code §§ 4-88-101, *et seq*.;

e.   the California Unfair Competition Law, Bus. & Prof. Code §§17200, *et seq*. and 17500, *et seq*.;

f.   the California Consumers Legal Remedies Act, Civil Code §1750, *et seq*.;

g.   the Colorado Consumer Protection Act, C.R.S.A. §6-1-101, *et seq*.;

h.   the Connecticut Unfair Trade Practices Act, C.G.S.A. § 42-110, *et seq*.;

i.   the Delaware Consumer Fraud Act, 6 Del. C. § 2513, *et seq*.;

j.   the D.C. Consumer Protection Procedures Act, DC Code § 28-3901, *et seq*.;

k.   the Florida Deceptive and Unfair Trade Practices Act, FSA § 501.201, *et seq*.;

l.   the Georgia Fair Business Practices Act, OCGA § 10-1-390, *et seq*.;

m.   the Hawaii Unfair Competition Law, H.R.S. § 480-1, *et seq*.;

n.   the Idaho Consumer Protection Act, I.C. § 48-601, *et seq*.;

o.   the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 501/1 *et seq*.;

p.   the Indiana Deceptive Consumer Sales Act, IN ST § 24-5-0.5-2, *et seq*.;

q.   The Iowa Private Right of Action for Consumer Frauds Act, Iowa Code Ann. § 714H.1, *et seq*.;

r.   the Kansas Consumer Protection Act, K.S.A. § 50-623, *et seq*.;

s.   the Kentucky Consumer Protection Act, KRS 367.110, *et seq*.;

t.   the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401, *et seq*.;

u.   the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 205-A, *et seq*.;

v.   the Maryland Consumer Protection Act, MD Code, Commercial Law, § 13-301, *et seq*.;

w.   the Massachusetts Regulation of Business Practices for Consumers Protection Act, M.G.L.A. 93A, *et seq*.;

x.   the Michigan Consumer Protection Act, M.C.L.A. 445.901, *et seq*.;

y.   the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq*.;

z.   the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq*.;

aa.   the Missouri Merchandising Practices Act, V.A.M.S. § 407, *et seq*.;

bb.    the Montana Unfair Trade Practices and Consumer Protection Act of 1973, Mont. Code Ann. § 30-14-101, *et seq*.;

cc.    the Nebraska Consumer Protection Act, Neb.Rev.St. §§ 59-1601, *et seq*.;

dd.    the Nevada Deceptive Trade Practices Act, N.R.S. 41.600, *et seq*.;

ee.    the New Hampshire Regulation of Business Practices for Consumer Protection, N.H.Rev.Stat. § 358-A:1, *et seq*.;

ff.    the New Jersey Consumer Fraud Act, N.J.S.A. 56:8, *et seq*.;

gg.    the New Mexico Unfair Practices Act, N.M.S.A. §§ 57-12-1, *et seq*.;

hh.    the New York Consumer Protection from Deceptive Acts and Practices, N.Y. GBL (McKinney) § 349, *et seq*.;

ii.    the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1, *et seq*.;

jj.    the North Dakota Consumer Fraud Act, N.D. Cent.Code Chapter 51-15, *et seq*.;

kk.    the Ohio Consumer Sales Practices Act, R.C. 1345.01, *et seq*.;

ll.    the Oklahoma Consumer Protection Act, 15 O.S.2001, §§ 751, *et seq*.;

mm.    the Oregon Unlawful Trade Practices Act, ORS 646.605, *et seq*.;

nn.    the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq*.;

oo.    the Rhode Island Deceptive Trade Practices Act, G.L.1956 § 6-13.1-5.2(B), *et seq*.;

pp.    the South Carolina Unfair Trade Practices Act, SC Code 1976, §§ 39-5-10, *et seq*.;

qq.    the South Dakota Deceptive Trade Practices and Consumer Protection Act, SDCL § 37-24-1, *et seq*.;

rr.    the Tennessee Consumer Protection Act, T.C.A. § 47-18-101, *et seq*.;

ss.    the Texas Deceptive Trade Practices-Consumer Protection Act, V.T.C.A., Bus. & C. § 17.41, *et seq*.;

tt.    the Utah Consumer Sales Practices Act, UT ST § 13-11-1, *et seq*.;

uu.    the Vermont Consumer Fraud Act, 9 V.S.A. § 2451, *et seq*.;

vv.    the Virginia Consumer Protection Act of 1977, VA ST § 59.1-196, *et seq*.;

ww.    the Washington Consumer Protection Act, RCWA 19.86.010, *et seq*.;

xx. the West Virginia Consumer Credit and Protection Act, W.Va.Code § 46A-1-101, *et seq*.;

yy. the Wisconsin Deceptive Trade Practices Act, WIS.STAT. § 100.18, *et seq*.; and

zz. the Wyoming Consumer Protection Act, WY ST § 40-12-101, *et seq*.

132. For brevity, Plaintiff will highlight Defendant's violations of only a few of these consumer protection statutes below. However, each of these consumer protection statutes is substantially similar, and was violated in the same way by Defendant.

133. For example, (1) the California False Advertising Law, Cal. Bus. & Prof. Code § 17500, and the fraudulent prong of Cal. Bus. & Prof. Code § 17200, prohibit practices that are likely to deceive or confuse the public, (2) the unfair prong of Cal. Bus. and Prof. Code § 17200 prohibits unfair business practices that either offend an established public policy or that are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and (3) the unlawful prong of Cal. Bus. and Prof. Code § 17200 prohibits any unlawful business practice.

134. Similarly, New York General Business Law ("GBL") § 349(a) prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in the state of New York.

135. HP violated Cal. Bus. & Prof. Code § 17500, all prongs of Cal. Bus. & Prof. Code § 17200, and NY GBL § 349(a) by using false and misleading statements to promote the sale of HP's Instant Ink Program subscriptions to Plaintiff and the Classes. As more fully set forth above, HP made misrepresentations that Plaintiff and Printing Class members would "never run out" of ink, such that they would not experience an interruption in their ability to use their printers. HP also made misrepresentations that the Program was environmentally friendly inasmuch as Subscribers would receive prepaid shipping materials that Environmental Class members could use to ship used cartridges back to HP—so they could recycle the ink cartridges provided through the Program for no additional cost—and that they would ultimately use fewer cartridges, less packaging, and less shipping.

136. HP's representations were misleading, false, and deceptive because HP failed to provide Plaintiff and the Printing Class members with working ink cartridges so they would "never run out" of ink. HP's representations were also misleading, false, and deceptive because HP failed to provide

Plaintiff and the Environmental Class members with prepaid shipping materials so that they could recycle their used ink cartridges for free, and because HP's failures caused them to use *more* cartridges, packaging, and shipping.

137.    HP knew that its misrepresentations and omissions were false and misleading at the time it made them because it knew that (1) it would instruct Subscribers to simply "throw away" ink cartridges provided through the Program instead of providing them with prepaid shipping materials with which Subscribers could send ink cartridges back to HP for recycling, (2) due to supply chain issues and/or its restrictive programming of its printers, it could not possibly timely provide Subscribers with replacement ink cartridges, such that Subscribers would not always have ink available to print, and (3) it would attempt to remedy these issues by simply sending Subscribers additional ink cartridges, thus resulting in more environmental waste.

138.    Prior to enrolling in the Program, Plaintiff and members of Classes read, saw, and understood the foregoing misrepresentations and omissions, and reasonably relied on them. As such, HP's false and misleading statements deceived Plaintiff, members of the Classes, and the general public.

139.    As a direct and proximate result of HP's misleading and false statements regarding the Program, Plaintiff and members of the Classes chose to enroll in the Program and/or purchase HP printers that come with a prepaid subscription to the Program.  As a result, Plaintiff and members of the Classes have suffered injury-in-fact in the form of lost time and money, as well as the loss of the use of their HP printers for extended periods of time.

140.    In other words, Plaintiff and members of the Classes reasonably relied to their detriment on HP's material misrepresentations and omissions.

141.    After enrolling in the Program, Plaintiff and members of the Classes learned that HP could not maintain the functioning of their printers, provide enough ink cartridges on a timely basis, or provide free recycling. Instead, the cartridges commonly malfunctioned and needed to be replaced. Further, the Program was not environmentally-friendly, as HP's failures resulted in *more* environmental waste, and HP told customers to "throw away" the cartridges instead of honoring its promise to recycle them for free.

142.  Therefore, Plaintiff and the Classes seek to rescind their contracts with HP and recover damages in connection with the promised features of the Program upon which HP did not deliver. Moreover, Defendant's violations were committed willfully and knowingly such that treble damages are warranted under, *inter alia*, GBL § 349(h).

143.  Alternatively, to the extent that Plaintiff's and members of the Classes' contracts with HP are not rescinded, Plaintiff and the Classes seek injunctive relief requiring HP to comply with its contractual obligations, or, in the event that it does not, enable Subscribers to mitigate their damages. For example, HP should be enjoined from requiring its printers to only accept ink cartridges provided through the Program whenever it cannot timely deliver replacement ink cartridges to Subscribers, so as to allow Subscribers to purchase ink cartridges locally and continue using their printers in the interim. Similarly, to the extent that Subscribers are required to recycle their ink cartridges at their own expense, HP should be required to reimburse Subscribers for the costs that they incur.

144.  Plaintiff, individually, and on behalf of the Classes, also seeks interest at the highest rate allowable by law, and an award of reasonable attorneys' fees and costs under applicable law, including Cal. Civ. Proc. Code § 1021.5 and GBL § 349(h).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually, and on behalf of the Classes defined above, prays for the following relief:

A.  An order certifying the Classes and/or Subclasses as defined above, appointing Plaintiff as the representative of the Classes and/or Subclasses, and appointing Plaintiff's counsel as Class Counsel;

B.  An order declaring that Defendant's actions, as set out above, constitute a breach of contract and the implied covenant of good faith and fair dealing;

C.  An order declaring that Defendant's actions, as set out above, violate the consumer protection statutes of the various states and the District of Columbia, including the fraudulent, unfair, and unlawful prongs of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, the California False Advertising Law, Cal. Bus. & Prof. Code § 17500, and New York's Deceptive Trade Practices Act, GBL § 349;

**CLASS ACTION COMPLAINT**

D.    An injunction requiring Defendant to cease the unlawful business practices described herein and otherwise protecting the interests of Plaintiff and the Classes and/or Subclasses, including requiring HP to correct its false statements regarding its ability to maintain functioning printers under the Instant Ink Program in accordance with its environmental promises;

E.    An order awarding rescission, restitution, other equitable relief, and damages to Plaintiff and the Classes and/or Subclasses, including punitive damages;

F.    An order awarding three times the actual damages under, *inter alia*, GBL § 349(h);

G.    An award of reasonable attorney's fees and costs pursuant to, *inter alia*, Cal. Civ. Proc. Code § 1021.5, and NY GBL § 349(h);

H.    Such other and further relief that the Court deems reasonable and just.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Dated: July 6, 2021                    Respectfully submitted,

RADEK BARNERT, individually and on behalf of all others similarly situated,

By: /s/ Mark L. Javitch
Mark L. Javitch (California SBN 323729)
JAVITCH LAW OFFICE
480 S. Ellsworth Ave
San Mateo CA 94401
Telephone: (650) 781-8000
Facsimile: (650) 648-0705
*mark@javitchlawoffice.com*

By: /s/ Thomas A. Zimmerman, Jr.
Thomas A. Zimmerman, Jr. (IL #6231944)*
Matthew C. De Re (IL #6317913)*
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Telephone: (312) 440-0020
Facsimile: (312) 440-4180
*tom@attorneyzim.com*

*Pending *Pro Hac Vice* Application

*Attorneys for Plaintiff and the Putative Classes*